In the Matter of **TRUST AMERICA SERVICE CORPORATION,** Debtor.

**Bankruptcy Nos. 89–9758–8B1, 90–1625–8B1 to 90–1629–8B1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Nov. 23, 1994.

---

Richard C. Prosser, Tampa, FL, for debtor.

John D. Goldsmith, Tampa, FL, for Creditor's Committee.

Douglas P. McClurg, Tampa, FL, for Coopers & Lybrand.

## ORDER ON FEE APPLICATIONS OF COOPERS AND LYBRAND

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

THIS CAUSE came on for consideration upon Final Evidentiary Hearing of United States Trustee's and Debtor's Objection to Coopers and Lybrand's Application for Compensation and Reimbursement of Expenses. The Court having considered the evidence, together with the record, makes the following findings.

### I. BACKGROUND OF DEBTORS

The above captioned case originated on December 28, 1989, as an involuntary bankruptcy case under Chapter 7 of Title 11, United States Code. The initial debtor, The Florida Group, Inc. (Florida Group), was converted to Chapter 11 case in February 1990. Soon thereafter, Trust America Service Corp. (Trust America Service), Resource America Mortgage, Inc. (Resource), S.W. Mortgage, Inc. (S.W. Mortgage), TARI, Inc. (TARI), and Trust America Acquisition Corp. (Trust America Acquisition) filed Chapter 11, and were consolidated with Florida Group at confirmation.[1]

The primary business of Debtors was the purchase of mortgage loans from vendors and reselling them in the secondary mortgage market. Debtors participated in the secondary mortgage market by purchasing Veterans' Administration guaranteed loans, Federal Housing Administration insured loans, and conventional fixed rate mortgage loans. All these agencies have guidelines in which Debtors were required to comply. Some Debtors, including Florida Group, participated as issuers of Government National Mortgage Association backed securities and Federal National Mortgage Association backed securities. These Associations are

1. Trust America Service Corp. is the parent corporation for the Florida Group, Inc., Resource America Mortgage, Inc., S.W. Mortgage, Inc, TARI, Inc., and Trust America Acquisition Corp. Subsequent to the Florida Group, Inc. filing for bankruptcy, the related Debtors, Resource America Mortgage, Inc., S.W. Mortgage, Inc., TARI, Inc., and Trust America Acquisition Corp. filed for relief February 23, 1990. Trust America Service Corp. filed December 31, 1990.

**416**

commonly referred to as "Ginnie Mae and Freddie Mac" (hereinafter referred to as GNMA), and have guidelines in which a servicer must comply. Service rights attach to mortgages retained by Debtors with respect to some of the loans in the various mortgage pools.

## II. PRE–PETITION ACTIVITIES OF COOPERS AND LYBRAND

Coopers and Lybrand, a national accounting firm, entered into an exclusive contract with GNMA to perform audits of participants in the secondary mortgage market, which included pre-petition Debtors, beginning January 1, 1989. Debtor's evidence summarizes Coopers and Lybrand's duties under that agreement with respect to work for GNMA in regards to Debtors pre-petition.

... [Coopers and Lybrand] is responsible for the following functions:

1. Reviewing issuer and custodian procedures and practices to determine that they conform to GNMA's requirements;

2. Reviewing monthly GNMA pool accounting reports, including associated follow-up with GNMA Issuers;

3. Providing GNMA Issuers and Custodians with answers to questions pertaining to GNMA procedural and servicing related matters....

The responsibilities of Coopers and Lybrand as auditor made it an integral part of the GNMA organization and facilitated compliance of mortgage issuers such as Debtors. In addition, Coopers and Lybrand acknowledged the importance of GNMA as a client. GNMA has been the second to fourth largest client of Coopers and Lybrand, warranting development of a specialized computer control system to service the account.

It should be noted Coopers and Lybrand's role in the auditing process encompasses default procedures when an issuer such as Debtors become in default. Default under the GNMA pool guidelines generally causes removal of a portfolio from an issuer, and placing the portfolio with a different entity who has contracted to provide service on the chance of a default. Coopers and Lybrand has offered testimony, it is the "arms, legs, eyes, [and] ears of [GNMA]," in the auditing process which makes recommendations GNMA uses to decide to place an issuer in default. In GNMA's proof of claim, GNMA has included Coopers and Lybrand pre-petition expenses incurred in performing audits on Debtor as an issuer.

Coopers and Lybrand was commissioned to investigate allegations against two affiliated debtors, Florida Group and TARI, in August 1989. The basis for the inquiry was Debtors had placed acquired loans from other entities into the GNMA pool without paying mortgage vendors. Coopers and Lybrand validated the allegations against Florida Group and TARI, and determined these debtors were placing funds into GNMA pools without paying the vendors of these loans. As a result of Coopers and Lybrand's investigation, Florida Group and Tari were placed in default.

## III. POST–PETITION ACTIVITIES OF COOPERS AND LYBRAND WITH RESPECT TO DEBTORS RELATED TO FLORIDA GROUP

In January 1990, subsequent to Florida Group filing for relief and prior to Resource, S.W. Mortgage, TARI, Trust America Acquisition, and Trust America Service filing for relief, GNMA commissioned Coopers and Lybrand to perform an examination on these affiliated debtors, other than Florida Group. The examination was completed on March 3, 1990, which was post-petition as to Resource, S.W. Mortgage, TARI, and Trust America Acquisition, and pre-petition on Trust America Service. As a result of the audit by Coopers and Lybrand, these debtors had their automatic underwriting privileges with Veterans' Administration (VA), Federal Housing Administration (FHA), and the Department of Housing and Urban Development (HUD) revoked. This action by VA, FHA, and HUD, became the impetus for Debtors' adversary proceeding seeking injunctive relief.

In an Adversary Proceeding instituted March 15, 1990, Resource, S.W. Mortgage, TARI, Trust America Acquisition, and Trust America Service, sought an injunction to prevent the VA, FHA, and HUD from revoking their automatic underwriting privileges, which where crucial to conducting a mortgage banking business. On May 3, 1990, this Court entered an injunction against VA, FHA, and HUD, with respect to those privileges. On June 7, 1990, this Court entered an Order against GNMA to abide by the provisions of the May 3, 1990, Order because of activities GNMA allegedly undertook to seize some of the S.W. Mortgage assets.

This Court's June 7, 1994, Order in the Adversary Proceeding permitted Coopers and Lybrand to observe the activities of S.W. Mortgage in representing GNMA's interests. Coopers and Lybrand subsequently performed on site auditing of S.W. Mortgage.

Florida Group's Creditors' Committee was not privy to this Adversary Proceeding and apparently did not receive notice as to the events that transpired as to the Adversary Proceeding. It should also be noted GNMA was not made a party to this Adversary Proceeding until Plaintiffs filed an Emergency Motion for Sanctions against GNMA on May 30, 1990.

## IV. ACTIVITIES OF COOPERS AND LYBRAND POST–EMPLOYMENT BY FLORIDA GROUP'S CREDITORS' COMMITTEE

On May 10, 1990, the Creditors' Committee for Florida Group filed an application to employ Coopers and Lybrand as accountants for the Committee. This Application was made just one week after this Court's May 3, 1990, Order granting an injunction in the Adversary Proceeding. The Creditors' Committee application was accompanied by Coopers and Lybrand's disclosure, of a "possible conflict" with Florida Group and work performed for GNMA, but made no reference to work performed for related debtors. The

disclosure in the Application for employment was made by an affidavit of Charles L. Pope, Jr. (Pope), a partner in the Tampa office of Coopers and Lybrand, which disclosed a possible conflict between Florida Group Creditors' Committee and work performed for GNMA. The consent of GNMA and Coopers and Lybrand was also obtained and submitted with the Application, and there was a conflict inquiry procedure instituted in Coopers and Lybrand's Philadelphia office as to employment by GNMA and for the Creditors' Committee of Florida Group.

On May 11, 1990, Debtors objected to Coopers and Lybrand's Application, raising objection to employment of Coopers and Lybrand as accountants for the Creditors' Committee which was based upon conflicts of interest. After a hearing on the application to employ and objection to employment, this Court entered its May 31, 1990, Order Authorizing the Official Committee of Unsecured Creditors to Retain Coopers and Lybrand as Accountants for the Official Committee of Unsecured Creditors. This Court's ruling was upon the condition "if it is later determined by this Court that Coopers and Lybrand has a conflict of interest in connection with this matter … the Court shall consider such conflict … when considering any application for fees." This Court's Order specifically provided "the relief granted in this Order shall be without prejudice to the right of any party in interest to object to any application for … fees."

This Court's Order authorizing the Creditors' Committee to retain Coopers and Lybrand as accountants was made one day after the Plaintiff's Emergency Motion for Sanctions filed against GNMA in the Adversary Proceeding.

## V. COOPERS AND LYBRAND'S APPLICATION FOR FEES

A Final Evidentiary Hearing was held on Coopers and Lybrand's Applications for

Fees.[2] Debtors' objection went to the conflict between Coopers and Lybrand's representation of the Creditors' Committee and GNMA.[3] Debtors' objection focused on GNMA's proof of claim which sets out pre-petition advances of $560,870.26, and $60,438 in fees for post-petition work performed by Coopers and Lybrand in default and seizure.

During Final Evidentiary Hearing on the Application for Compensation, and upon this Court's own inquiry, this Court questioned a partner of the Coopers and Lybrand Tampa office as to the results of Coopers and Lybrand's in-house conflict of interest investigation. Testimony revealed Coopers and Lybrand used an in-house process requiring all litigation to be passed through a clearinghouse partner, the responsibility of which was to institute a mechanism to determine if there was a possibility of a conflict. Upon discovery of a potential conflict, Coopers and Lybrand would utilize a procedure to prevent dissemination of any information from work performed for one client to another client. The partner for the Coopers and Lybrand office in Tampa testified he had many discussions at the time of the Application to Employ in regards to the potential for conflict. Discussions with respect to work performed for GNMA and the proposed employment for a creditors' committee included contacting the Coopers and Lybrand conflict research team located in Philadelphia. The partner

was assured in advance of receiving a conflict report that there was no conflict so long as proper steps were taken, and all parties were made aware of those protections. To ensure GNMA's cooperation, the partner was also instrumental in obtaining a release from GNMA on this particular matter, and obtaining assurances from the partner-in-charge of the GNMA agreement that there would be no conflict with GNMA.

Testimony at Final Evidentiary Hearing was consistent with the partner's Affidavit in support of the Application to Employ, but his Affidavit was not based upon his firm's computerized conflict search. Pope performed his own independent conflict research with other partners in the firm and with GNMA. During Final Evidentiary Hearing, and upon this Court's own inquiry, it was determined Pope had not obtained his firm's conflict search when he made his affidavit. The Coopers and Lybrand conflict search report was made available some time later in June 1990, after the application for employment was made, and this Court had made its ruling with regards to GNMA in the Adversary Proceeding involving S.W. Mortgage.

The Coopers and Lybrand computer search, which was completed after Application for employment, confirmed the Affidavit Pope filed with the Application to employ. The computer search and Pope's conflict inquiry did not reveal any of the activities Coopers and Lybrand was involved in post-petition with related Debtors.

2. The applications for fees and expenses are as follows:

| Application | Application Date | Fees | Costs | Hours | Dates |
|---|---|---|---|---|---|
| First Interim Fee Application | November 15, 1990 | $133,384.75 | $4,044.43 | 955.0 | 5/31/90–9/15/90 |
| Second Application Supplementing First | March 15, 1991 | $79,672.82 | $2,555.03 | 457.3 | 9/16/90–2/28/91 |
| Final Fee Application | May 17, 1991 | $20,561.25 | 0.00 | 102.7 | 3/1/91–5/15/91 |
| Supplement to Final Fee Application | July 12, 1991 | $11,902.00 | 0.00 | 61.6 | 5/16/91–7/8/91 |
| Totals | | $245,520.80 | $6,599.46 | 1,576.6 | |

3. Debtors' objections are specifically set out in its July 16, 1991, Objection to Administrative Claim of Coopers and Lybrand as:
 a. Conflict of interest between GNMA and the Creditors' Committee;
 b. Excessive Hourly rates;
 c. Duplicative and excessive services performed; and,
 d. Request for compensation for overhead expenses.

## VI. IS COOPERS AND LYBRAND'S REPRESENTATION OF GNMA AND THE CREDITORS' COMMITTEE PERMISSIBLE?

■ The linchpin of the following analysis is the nature and extent of Coopers and Lybrand's employment with GNMA and its relationship with the Creditors' Committee, and whether conflicts of interest arose as a result of these two relationships to cause disallowance of fees. As ruled upon in *In re Celotex Corp.*, 123 B.R. 917, 921–22 (Bankr. M.D.Fla.1991): "[w]e are not concerned with the employment of counsel who previously represented the debtor and now seeks employment as the trustee's or debtor-in-possession's attorney. Nor are we concerned with an attorney's mere representation of a creditor who is now on the creditor's committee. Such a velleity is not to be found here." *Celotex*, 123 B.R. at 921. This Court's concern rests upon the adverse interests caused by representing a creditor with a substantial stake in debtors' Chapter 11, and representing the unsecured creditors' committee for the same debtor.

■ Under 11 U.S.C. § 1103(b), the Bankruptcy Code establishes "[a]n ... accountant employed to represent a ... [creditors' committee] ... may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case." This section ensures a member of a Chapter 11 creditors' committee maintains a fiduciary responsibility to the class the committee represents. 5 *Collier on Bankruptcy*, ¶ 1103.07. Where a professional is not a "disinterested person, or represents or holds an interest adverse to the interests of the estate with respect to the matter on which the professional person is employed," it will be denied allowance of compensation. 11 U.S.C. § 328(c).[4] This policy serves a prophylactic purpose by removing the tendency of mixed and divided loyalty. The serious treatment of conflicts of interest is a deterrent to professionals seeking employment that may cause a conflict of interest. "Congress enacted 11 U.S.C. § 1103(b) to avoid the potential of serious conflicts of interest that exists where professionals are permitted to represent more than one entity in a bankruptcy proceeding.'" *In re Evans Products Company*, 58 B.R. 572, 574 (Bankr.S.D.Fla.1985).

■ Section 1103(b) clearly prohibits employment of a professional such as an accountant where an adverse interest causes a conflict. *In re Celotex Corp.*, 123 B.R. 917, 921–22 (Bankr.M.D.Fla.1991) (representation of asbestos litigation group and official unsecured creditors' committee of a related debtor prohibited); *Locks v. United States Trustee*, 157 B.R. 89, 93 (W.D.Pa.1993) (affirmed bankruptcy court's holding prohibiting dual representation of committee of bodily injury claimants and future claimants).[5] The last sentence of subsection (b), which allows representation of a committee and representation of others in connection with the case, was added by the Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub. No. L. 98–353, 98 Stat. 384. A professional may represent a creditors' committee and an individual creditor as long as there is no adverse interest.

■ This Court realizes there may be instances where a professional could permissibly represent a creditors' committee and another creditor, but those instances may never encompass a conflict of interest as in the instant case. The conflict of performing accounting for the Creditors' Committee and GNMA affords this Court the opportunity to review the appropriateness of awarding professional fees to that accountant. There is no necessity to inquire into whether the services Coopers and Lybrand performed were essential. *In re Futuronics Corp.*, 655 F.2d

---

4. An interest adverse to the estate has been defined as "**any** economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute." *[Emphasis added]* *In re American Printers and Lithographers, Inc.*, 148 B.R. 862, 865 (Bankr.N.D.Ill.1992). "Adverse Interest" includes a conflict of interest. *In re McNar, Inc.*, 116 B.R. 746, 750 (Bankr.S.D.Cal.1990) ("[t]he only true safe harbor for those professionals subject to the stringent fiduciary standards of §§ 327 and 1103, is to represent only a single client when that client is in, or likely headed for bank-

ruptcy court.") *See In re Electro–Optix, U.S.A., Inc.*, 130 B.R. 621 (Bankr.S.D.Fla.1991).

5. One decision on an application to employ has held accountants do not represent their clients, and so cannot be involved in a conflict of interest. *In re Aircraft Instrument and Development, Inc.*, 151 B.R. 9ʹ9, 943 (Bankr.D.Kan.1993). This Court does n ⠤ endeavor to make a distinction between a ʾessional's representation of its clients anᴜ ᴧere "internal accounting" transactions. *Id.* at 943.

463 (2nd Cir.1981). In addition, the fact disclosure was not made with respect to the related debtors requires revisiting this Court's Order approving Coopers and Lybrand as accountants for the Creditors' Committee. In the instant case, a related debtor was involved in an adversary proceeding while an application for employment was pending, suggesting a diligent research was not performed prior to application. Further, it is Coopers and Lybrand's duty, as well as having the burden of proof, as applicant, to make "full, candid, and complete disclosure." *In re Maui 14K Ltd.*, 133 B.R. 657 (Bankr. D.Haw.1991). *See also In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 845 (Bankr. S.D.Ill.1993). Coopers and Lybrand simply did not make an adequate inquiry and the internal conflict search performed by them did not represent an accurate report because crucial information as to work performed for related debtors was not supplied.

■ To ensure themselves no conflict existed with respect to related debtors, the duty was not solely limited to Coopers and Lybrand in Tampa, but was a duty of the whole organization of Coopers and Lybrand. Coopers and Lybrand had a duty to ensure themselves of no conflict with all departments and locations of its partnership. Federal Rules of Bankruptcy Procedure require a professional to disclose connections with any party in interest in connection with a debtor. Fed.R.Bank.P. 2014(a). In the instant case Coopers made no disclosure of the fact it represented GNMA against debtors related to Florida Group.

■ Coopers and Lybrand suggest their initial disclosure with respect to Florida Group, the consent of GNMA and all the unsecured creditors of Florida Group, and the fact Debtors allowed them to perform the accounting for the Creditors' Committee of Florida Group, albeit over objections, estop Debtors from reaping the fruits of Coopers and Lybrand's accounting efforts without payment.[6] Obtaining the consent of GNMA

does not assist Coopers and Lybrand because neither 11 U.S.C. § 1103(b), nor 11 U.S.C § 328(c), may be waived. The reluctance to rely on waiver is to ensure the fiduciary duty is always met. *Evans Products Company*, 58 B.R. 572, 575 (S.D.Fla. 1985); *In re Saxon Industries, Inc.*, 29 B.R. 320, 322 (Bankr.S.D.N.Y.1983); *In re Combustion Equipment Associates, Inc.*, 8 B.R. 566 (Bankr.S.D.N.Y.1981); *In re Proof of the Pudding, Inc.*, 3 B.R. 645 (Bankr.S.D.N.Y. 1980); *but see In re Lee*, 94 B.R. 172, 177 (Bankr.C.D.Cal.1988) (Debtor, creditors, and Trustee consent effectuated waiver).

■ This Court recognizes there may be an instance in which the potential of a conflict can be removed by implanting sufficient protective measures to ensure there is no dissemination of information while isolating the conflict. The statutory backdrop and case law has defined boundaries in which such professional conduct must conform. The facts herein do not require an extension or an adjustment to those boundaries. Even though the precise nature and particulars of Coopers and Lybrand's employment in the instant case are unusual, the application of the law to these particular set of facts is routine.

Upon the belief of a potential conflict, Coopers and Lybrand's Tampa Office utilized a procedure to prevent dissemination of any information from work performed for the Creditors' Committee to any Coopers and Lybrand office. The same procedure was set up by the Washington, D.C. office to prevent dissemination of information from work performed for GNMA. This procedure was referred to as a "chinese wall," and was instituted upon employment of Coopers and Lybrand for the Creditors' Committee. There was testimony, however, personnel from Coopers and Lybrand's Orlando division, which was GNMA's agent in participating in the seizure of S.W. Mortgage's portfolios, logged some hours on behalf of the Creditors' Committee in obtaining general ledger detail, op-

---

**6.** The professional has a duty, as well as the burden of proof, to make "full, candid, and complete disclosure in an application for employment." *In re Maui 14K Ltd.*, 133 B.R. 657 (Bankr.D.Haw.1991). *See also In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 845 (Bankr.S.D.Ill.1993). This duty is continuing and cannot be shifted. *In re EWC, Inc.*, 138 B.R. 276, 281 (Bankr.W.D.Okl.1992); *Granite*, 159 B.R. at 847.

erating check registers, and canceled checks on related Debtor S.W. Mortgage.

■ Yet, even without the issue of conflict, the evidence tends to suggest the "chinese wall" may not have been effective, notwithstanding it being deemed a sufficient mechanism at the outset of the engagement. Coopers and Lybrand's evidence, however, intimates Orlando office personnel used for the Creditors' Committee work, were not permitted to be utilized to perform functions for GNMA, even though they may be located in the same office. Regardless, the mere fact there were activities being performed for GNMA and the Creditors' Committee displays a conflict of interest, where GNMA's auditing was to protect its interests while adverse to the Unsecured Creditors' Committee.

■ There does not appear to be any authority to suggest when a conflict exists and protective measures as to dissemination such as a "chinese wall," remove the possibility of conflict information being divulged, an adverse interest should be ignored. A "chinese wall" typically protects a client from the past activities and information of representation of an adverse client. The "chinese wall" is generally not an acceptable means of conflict avoidance where the same professional organization actively represents two adverse interests.

In the instant case, Cooper and Lybrand simultaneously represented the Creditors' Committee as well as one of the largest unsecured creditors, GNMA. Not only was there a relationship with GNMA, one of Coopers and Lybrand's most important clients pre-petition and a creditor of Debtors, but services were performed for GNMA post-petition adverse to the interests of Debtors, and probably the interests of the Creditors' Committee.

Coopers and Lybrand represented GNMA in auditing and seizure of S.W. Mortgage's mortgage portfolios and auditing of Resource, TARI, Trust America Acquisition, and Trust America Service. At the same time Coopers and Lybrand was performing investigative research of Florida Group's activities and auditing of Florida Group for the Creditors' Committee. Seizure of portfolios from debtors would typically inhibit Debtors', as issuers, ability to function. This result is adverse to all those represented by the Creditors' Committee.

In addition, Coopers and Lybrand's evidence supports it tried to avoid conflict of interest with respect to Florida Group. As stated above, Coopers and Lybrand performed an internal conflict search which was instituted prior to the Creditors' Committee engaging their services. Coopers and Lybrand, however, did not discover conflicts which it should have known existed with related debtors, while simultaneously employed by the Creditors' Committee. The fact Coopers and Lybrand's search did not discover these related debtors suggests the internal conflict search was not performed adequately enough, nor were the proper inquiries made. Coopers and Lybrand, at the time their Application was approved for Employment as accountants for the Creditors' Committee, was on notice of all Debtors and the conflict which arose by representing the Creditors' Committee and a major creditor.

## VII. CONCLUSION

■ Allowing dual representation by professionals, where the representation is unrelated or so de minimis, or a procedure such as a "chinese wall" would be a protective measure, is a possibility. The facts, however, in the instant case do not support a finding of de minimis representation, and Coopers and Lybrand's representation was anything but unrelated. Coopers and Lybrand worked for GNMA and the Creditors' Committee in an adversarial set of circumstances. Coopers and Lybrand, because of their fiduciary duty to all creditors by virtue of employment as creditors' committee accountants, had a conflict of interest as regards their employment with GNMA.

Coopers and Lybrand must be denied allowance of compensation for services and reimbursement of expenses under 11 U.S.C. §§ 327 and 328(b) by virtue of the prohibition of conflicts of interest under 11 U.S.C. § 1103(b).

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED the Debtor's Objection to Coopers and Lybrand's Application for Compensation and Reimbursement of Expenses be, and the same are hereby, sustained. It is further

ORDERED, ADJUDGED AND DE-CREED Coopers and Lybrand's Application for Compensation and Reimbursement of Expenses be, and the same is hereby, disapproved.

DONE AND ORDERED.